1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 01, 2024

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

HOLLY R.,[1]

                    Plaintiff,

        v.

MARTIN O'MALLEY, Commissioner of
Social Security,[2]

                    Defendant.

No.    4:23-cv-05107-EFS

**ORDER REVERSING THE ALJ'S
DENIAL OF BENEFITS, AND
REMANDING FOR FURTHER
PROCEEDINGS**

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), he is hereby substituted for Kilolo Kijakazi as the defendant in this suit.

Due to bilateral knee pain, arthritis, chronic fatigue, foot pain, anxiety, panic attacks, depression, and carpal tunnel syndrome, Plaintiff Holly R. claims that she is unable to work fulltime and applied for supplemental security income benefits. She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly analyzed the opinions of Rikki Cook, LMHC, and David Davis-Boozler, MD; and the ALJ improperly assessed Plaintiff's credibility. As is explained below, the ALJ erred. This matter is remanded for further proceedings.

## I.    Background

In November 2019, Plaintiff filed an application for benefits under Title 16, claiming disability beginning January 1, 2019,[3] based on the physical and mental impairments noted above.[4] Plaintiff's claim was denied at the initial and reconsideration levels.[5]

After the agency denied Plaintiff benefits, ALJ Palachuk held a telephone hearing in June 2022, at which Plaintiff appeared with her representative.[6] Plaintiff and a vocational expert testified.[7]

---

[3] This was later amended to October 15, 2019, as noted below.

[4] AR 183-194, 215.

[5] AR 88, 101, 104.

[6] AR 36-58.

[7] *Id.*

1    After the hearing, the ALJ issued a decision denying benefits.[8] The ALJ

2 found Plaintiff's alleged symptoms were not entirely consistent with the medical

3 evidence and the other evidence.[9] As to medical opinions, the ALJ found:

4    - The opinions of state agency evaluators Matthew Comrie, PsyD, and

5      Patricia Kraft, PhD, to be not persuasive.

6    - The opinions of state agency physicians Robert Stuart, MD, and

7      Gordon Hale, MD, to be not persuasive.

8    - The opinions of consultative examiner Linda Lindman, PhD, to be

9      somewhat persuasive.

10   - The opinions of David Davis-Boozler, MD, to be somewhat persuasive.

11   - The opinions of Rikki Cook, LMHC, to be not persuasive.[10]

12 As to the sequential disability analysis, the ALJ found:

13   - Step one: Plaintiff had not engaged in substantial gainful activity

14     since October 15, 2019, the date of her application.

15   - Step two: Plaintiff had the following medically determinable severe

16     impairments: degenerative joint disease, bilateral knees;

17

18

_____

19 [8] AR 15-33. Per 20 C.F.R. § 416.920(a)–(g), a five-step evaluation determines

20 whether a claimant is disabled.

21 [9] AR 27-32.

22 [10] AR 25-26.

23

patellofemoral arthritis, right knee; depression; and adjustment disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC:  Plaintiff had the RFC to perform light work with the following exceptions:

  She can frequently crouch and crawl but can only occasionally kneel.  She is able to understand, remember and carry out simple, routine tasks; can maintain concentration, persistence and pace for 2-hour intervals between regularly scheduled breaks; and requires a predictable work environment with seldom change.

- Step four: Plaintiff has no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a collator operator (DOT 208.685-010), merchandise marker (DOT 209.587-034), and family storage rental clerk (DOT 295.367-026).[11]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[12]

---

[11] AR 20-28.

[12] AR 176.

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[13] and such error impacted the nondisability determination.[14] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[15]

## III.    Analysis

Plaintiff seeks relief from the denial of disability on two grounds. She argues the ALJ erred when evaluating the medical opinions and when evaluating

---

[13] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[14] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[15] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

1    Plaintiff's subjective complaints.[16]  As is explained below, the Court concludes that

2    the ALJ consequentially erred in her evaluation of the medical opinion evidence.

3    **A.    Medical Opinion: Plaintiff establishes consequential error**

4         Plaintiff argues the ALJ erred in her evaluation of the medical opinions.[17]

5    Specifically, Plaintiff first argues that the ALJ erred in finding the opinions of

6    LMHC Cook to be not persuasive because LMHC Cook never personally examined

7    Plaintiff, the opinions were inconsistent with the overall record, and the opinions

8    were specifically contradicted by the findings of the consultative examiner, Dr.

9    Linda Lindman, who was more qualified than LMHC Cook. Plaintiff also argues

10   that the ALJ erred in rejecting Dr. Davis-Boozler's limitation to walking for four

11   hours because her reasoning that the limitation was "vague" is not supported by

12   substantial evidence.

13

14

15

16   _____

17   [16] Plaintiff also avers that these errors resulted in an improper determination at

18   step five.

19   [17] An ALJ must consider and articulate how persuasive she found each medical

20   opinion, including whether the medical opinion was consistent with and supported

21   by the record. 20 C.F.R. § 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th

22   Cir. 2022).

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1.    Standard

The ALJ was required to consider and evaluate the persuasiveness of the medical opinions and prior administrative medical findings.[18] The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[19] Supportability and consistency are the most important factors,[20] and the ALJ must explain how she considered the supportability and consistency factors when reviewing the medical opinions and support her explanation with substantial evidence.[21] The ALJ may consider, but is not required to discuss the following additional factors: the source's relationship to Plaintiff such as length of the treatment, purpose of the treatment relation and whether the source examined Plaintiff, as well as whether the source had advanced training or experience to specialize in the area of medicine in which the opinion

---

[18] 20 C.F.R. § 416.920c(a), (b).

[19] 20 C.F.R. § 416.920c(c)(1)–(5).

[20] *Id.* § 416.920c(b)(2).

[21] *Id.* § 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The agency must articulate . . . how persuasive it finds all of the medical opinions from each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings.") (cleaned up).

1  was being given.[22] When considering the ALJ's findings, the Court is constrained to

2  the reasons and supporting explanation offered by the ALJ.[23]

3      2.    Plaintiff's Testimony

4      On June 29, 2022, Plaintiff appeared with her attorney for a telephone

5  hearing before ALJ Palachuk.[24]  The Plaintiff testified and a vocational expert,

6  Mark Mann, testified.[25]  At the hearing, Plaintiff's attorney moved to amend her

7  onset date to coincide with the protective filing date of October 15, 2019.[26] Plaintiff

8  testified that in October of 2019 she was trying to do some in-home childcare but

9  was not able to watch children properly due to panic attacks.[27] When she got the

10  panic attacks, it was hard to do anything.[28] Plaintiff stated that she able to

11  complete state training in 2021 to be paid by the state to care for the children of a

12  friend.[29] Plaintiff said that she watched her friend's one-year-old and four-year-old

13

14  [22] Id.

15  [23] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court

16  review is constrained to the reasons the ALJ gave).

17  [24] AR 36-58.

18  [25] *Id.*

19  [26] AR 41.

20  [27] AR 41-42.

21  [28] *Id.*

22  [29] *Id.*

23

children on a full-time basis until her friend moved to Utah.[30]Plaintiff said that she started watching them at the friend's home but later watched them at her own home to reduce the number of panic attacks.[31]  She said that she has panic attacks four times a week.[32]

Plaintiff said that when she has a panic attack she has a hard time breathing and needs to be alone for thirty to forty-five minutes.[33] The coping techniques do not always work and half of the time she does not fully recover for an extended time.[34] She has missed appointments because she could not leave the house due to a panic attack.[35] She said that if she was watching the children when she had a panic attack she would put on a show for them and would then sit by herself and try to calm down.[36] When the children were in the room, it took longer to calm down.[37] Plaintiff said that she tried to do a day of shadowing a delivery

---

[30] AR 43.

[31] *Id.*

[32] *Id.*

[33] AR 44.

[34] *Id.*

[35] *Id.*

[36] AR 45.

[37] *Id.*

driver for Crumble Cookies.[38] If she were to get a job as a fill-in delivery driver she would need to be able to bake, box, and deliver cookies.[39] Plaintiff thought she would be able to do the job because it had limited public contact but on her first day she had a panic attack.[40]

Plaintiff said that eight percent of the time that she leaves home she will have a panic attack so she is usually either late for her appointments or needs to cancel them.[41] She said that she needs to go home after being out for an hour.[42] Plaintiff testified that earlier in the year she had not been able to take her medication because she did not have a primary care provider and her mental health declined as a result, with her having more panic attacks.[43]

Plaintiff testified that prior to her knee replacement surgery she could only stand for twenty to thirty minutes a day, but that after the surgery she was able to walk on it for up to twenty-five minutes a day and stand for longer.[44] Plaintiff said that before the surgery she could only stand for up to thirty minutes about three

---

[38] *Id.*

[39] AR 45-46.

[40] AR 46.

[41] *Id.*

[42] AR 47.

[43] *Id.*

[44] AR 48.

times a day and that after the surgery she could stand for that amount of time about six times a day.[45] She testified that it took about six months of recovery after the surgery for her to be able to stand or walk for that long.[46] Plaintiff stated that she can lift ten to fifteen pounds and that her hand will go numb if she lifts more.[47] She also said that her knee will lock or give out if she lifts more than fifteen pounds.[48] She said that when she was babysitting she would have the child crawl into her lap so she did not need to lift them.[49]  She said that her medication makes it hard to focus and she has a hard time focusing when she is out in public with more than three or four people.[50] She said that when she has a panic attack it is hard to concentrate on anything.[51] She said that sometimes she cannot focus for the whole day and needs to lie down for about forty-five minutes to rest due to low energy.[52]

---

[45] AR 48-49.

[46] AR 49.

[47] *Id.*

[48] AR 50.

[49] *Id.*

[50] AR 51.

[51] *Id.*

[52] AR 52.

1       The ALJ asked the VE to assume that Plaintiff had a high school education

2   and no work experience.[53] VE testified that an individual of Plaintiff's age,

3   education, and work experience who was limited to light work, and with all

4   posturals performed frequently except for kneeling which would only be performed

5   occasionally, the individual could perform the following jobs: collator operator

6   (DOT 208.685-010), merchandise marker (DOT 209.587-034), and rental clerk

7   (DOT 295.367-026).[54]   The ALJ then gave a second hypothetical in which the

8   individual would be limited to all postural occasionally, and would have the

9   following additional limitations: able to understand, remember, and carry out

10  simple tasks; could maintain concentration, persistence, and pace on simple

11  routine tasks for the two-hour interval between breaks; and needs to be in a

12  predictable environment with seldom change.[55] The VE testified that the three jobs

13  identified could still be performed.[56]   The VE testified that the only aspect of his

14  testimony not addressed by the DOT was that regarding a predictable

---

[53] AR 54.

[54] AR 54-55.

[55] AR 55.

[56] *Id.*

environment.[57] He said that his testimony regarding a predictable environment was based on his 30 years of field experience.[58]

The VE testified that the individual could be absent one day per month and off-task no more than ten percent.[59] He stated that an individual who took unscheduled breaks of twenty to thirty minutes three times a week would not be able to maintain employment.[60]

3. <u>Relevant Medical Records</u>

a. <u>*Physical impairments*</u>

i. *Trios Health*

On March 12, 2019, Plaintiff presented to ARNP Joshua Anderson, requesting a new referral for insurance purposes to Dr. Jacob Stanfield for her knee.[61] On examination, Plaintiff reported that she stopped seeing her psychiatrist due to personality conflict and was recently experiencing depression and anxiety

---

[57] *Id.*

[58] *Id.*

[59] AR 56.

[60] AR 56-57.

[61] AR 342.

with fatigue.[62] She was in no acute distress and was ambulating normally.[63] She was diagnosed with pain in her right knee and major depressive disorder.[64]

On March 28, 2019, Plaintiff presented to ARNP Anderson with complaints of injury to her left wrist after tripping and falling.[65] On examination, she was ambulating normally, was in no acute distress, and had tenderness to palpation over the left distal ulna.[66] An x-ray indicated no fracture.[67]

On May 13, 2019, Plaintiff presented to ARNP Anderson with acute pharyngitis.[68] On examination, she had muscle ache, muscle weakness and pain in her right shoulder with abduction and circumduction, and was tender on palpation and was painful with abduction and extension beyond 90 degrees or with any circumduction.[69]

---

[62] *Id.*

[63] *Id.*

[64] AR 342-343.

[65] AR 340.

[66] *Id.*

[67] AR 345.

[68] AR 336.

[69] AR 338.

On September 3, 2019, Plaintiff presented to Adam Smith, DO, at Trios Health for an annual OB-GYN exam.[70] On examination, Plaintiff reported hot flashes as well as knee pain and the need for a knee replacement.[71]

### ii.    Kadlec Orthopedic

On December 13, 2018, Plaintiff presented to Doyle Miller, MD, with complaints of progressively worsening pain in her right knee.[72] She reported constant aching with a stabbing pain rated at a 9 out of 10,  and swelling and locking of the knee.[73] Plaintiff also reported that the pain was worse at night.[74] On examination, Plaintiff was anxious with dysphoric mood and sleep disturbance; and had tenderness to the medial joint line and medial patellar facet.[75] All results were within normal limits other than tenderness in the patellar region.[76]  Plaintiff was sent for an MRI of the right knee, which revealed advanced degeneration of the patellofemoral compartment with full-thickness chondral loss; large knee-joint

---

[70] AR 331.

[71] AR 333.

[72] AR 407.

[73] *Id.*

[74] *Id.*

[75] AR 408-409.

[76] *Id.*

effusion; and degenerative free edge fraying of the lateral meniscal body.[77] Plaintiff was diagnosed with right knee degenerative joint disease (DJD) with severe patellofemoral arthritis.[78] Dr. Miller advised that Plaintiff should not have arthroscopic surgery due to her age but should attempt to manage the condition with conservative treatment and get a total knee replacement if her pain persisted.[79]

On March 13, 2019, Plaintiff presented to Jacob Stanfield, MD, following an injection.[80] Plaintiff reported continued severe pain as a result of her "significant patellofemoral osteoarthritis."[81] Dr. Stanfield noted that Dr. Miller felt arthroscopic surgery would not be beneficial and noted that on examination Plaintiff experienced tenderness in the medial joint line, medial retinaculum, lateral retinaculum, and Plica.[82] Dr. Stanfield thought that Plaintiff would be a good candidate for knee replacement but should exhaust conservative treatments such as injections and radiofrequency ablation due to her age.[83]

---

[77] AR 408-409.

[78] AR 409.

[79] *Id.*

[80] AR 410.

[81] *Id.*

[82] *Id.*

[83] AR 411.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

On March 17, 2019, Plaintiff underwent an intracapsular lidocaine injection to the right knee performed by Arash Motagi, DO.[84] On examination, Plaintiff's gait was antalgic.[85] Plaintiff was diagnosed with chronic pain in her right knee "due to significant amount of degeneration and arthritis in her right knee."[86] Dr. Motaghi noted that Plaintiff had tried conservative therapies with minimal relief and he recommended a right knee genicular nerve block, as doctors were attempting to postpone knee replacement due to Plaintiff's age.[87] On May 15, 2019, Plaintiff returned to Dr. Motaghi, reporting only mild relief from the nerve block performed.[88] Dr. Motaghi assessed Plaintiff with chronic pain of the right knee and opined that she received eighty-percent relief from the genicular nerve blocks.[89] Dr. Motaghi suggested that Plaintiff should undergo radiofrequency ablation.[90]

On June 10, 2019, Plaintiff presented to Dr. Stanfield reporting that her recent radiofrequency ablation had given her only minimal relief and that she

---

[84] *Id.*

[85] AR 415.

[86] *Id.*

[87] *Id.*

[88] AR 416-417.

[89] AR 420.

[90] *Id.*

DISPOSITIVE ORDER - 17

needed a steroid injection in her knee.[91] On examination, Plaintiff had tenderness at the medial joint line, medial retinaculum, lateral retinaculum, and Plica.[92] Dr. Stanfield administered an injection and assessed her as suffering from primary osteoarthritis of the right knee.[93] He opined that Plaintiff was young for a knee replacement surgery but it was likely her only option due to significant degenerative changes in her knee.[94] Dr. Stanfield recommended that Plaintiff try to manage symptoms for as long as possible before scheduling the knee replacement.[95] On September 11, 2019, Plaintiff presented to Dr. Stanfield seeking an injection for her right knee.[96] On examination, Plaintiff exhibited pain and crepitus with motion.[97]  Dr. Stanfield noted that Plaintiff had attempted injections, radiofrequency ablation, bracing, and anti-inflammatories, as well as physical therapy but not gotten relief.[98] Because pain symptoms were interfering with her

---

[91] AR 421.

[92] *Id.*

[93] AR 422.

[94] *Id.*

[95] *Id.*

[96] AR 422-423.

[97] AR 423.

[98] AR 424.

activities of daily living, Plaintiff was seeking permanent treatment.[99]

Dr. Stanfield noted that conservative measures had failed and that he had

counseled against knee replacement if possible, but symptoms were severe and

conservative measures were not helpful, so knee replacement would be considered

in the summer.[100]

### iii.    Dr. Davis-Boozler

On January 24, 2021, Plaintiff was examined by David Davis-Boozler, MD,

at the request of the Commissioner.[101] Dr. Davis-Boozler noted that he reviewed

the records of Dr. Stanfield from June 10, 2019, and December 18, 2019.[102]

Plaintiff reported that she had bilateral knee pain which progressed over the last

two to three years, and that she had a right knee replacement and later a

manipulation under anesthesia.[103] She also reported left foot pain due to a ganglion

cyst and chronic fatigue for the past twelve months.[104] Plaintiff reported that she

lived with her three children and ran a babysitting service, and was able to do such

---

[99] *Id.*

[100] AR 425.

[101] AR 850-856.

[102] AR 851.

[103] *Id.*

[104] AR 852.

DISPOSITIVE ORDER - 19

activities as cooking, cleaning, shopping, and yard work.[105] On examination, Plaintiff's blood pressure was elevated; she was appropriately dressed and showed no unusual habits or distress; she had a normal gait and was able to rise from a chair and the table without help; Plaintiff could walk on her heels and toes, balance, bend and squat halfway; straight leg testing was negative; motor function and strength were normal in all extremities; range of motion was normal in all extremities with the exception of limited flexion in the knees; and sensory examination was normal in all extremities.[106] Dr. Davis-Boozler diagnosed Plaintiff with bilateral knee pain with good prognosis; left foot pain with good prognosis; and chronic fatigue with good prognosis.[107]

An X-ray of the left foot taken on January 26, 2021, indicated no acute injury.[108]

b.    *Mental impairments*

i.    *Three Rivers Therapy*

On July 24, 2019, Plaintiff presented to Diana Crane, care coordinator, for initial evaluation.[109] Plaintiff reported that she had PTSD and it was difficult to

---

[105] *Id.*

[106] AR 853-855.

[107] AR 855.

[108] AR 857.

[109] AR 593.

leave her home following a divorce in 2017.[110] Plaintiff reported stresses due to her relationship with her ex-husband and finances.[111] Plaintiff reported that she was supporting herself, her children, and her mother with what she made as a full-time daycare manager.[112] Ms. Crane assessed Plaintiff with generalized anxiety disorder and major depressive disorder, single episode, mild.[113]

On September 10, 2019, Plaintiff presented to ARNP Debra Pugh for initial evaluation.[114] Plaintiff reported that the medication she had been taking for the last two years was not effective and that she was struggling financially after a divorce and having to subsist on her salary as a full-time daycare manager.[115] Plaintiff reported that she completed high school and attended some college.[116] Plaintiff also reported that she had stress because after her divorce she was not allowed visitation with her step-daughter, and her ex-husband was seeking custody of their shared children. On mental status examination, Plaintiff was dressed appropriately; had good eye contact; had normal speech volume and rate; had a

---

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] AR 596.

[114] AR 573.

[115] *Id.*

[116] AR 574.

sad, depressed and anxious mood; had intact insight, judgment, memory, concentration, and thought content; had no homicidal or suicidal ideations; but had a poor body image.[117] ARNP Pugh diagnosed Plaintiff with generalized anxiety disorder and major depressive disorder, single episode, mild.[118]

On October 29, 2019, Plaintiff presented to ARNP Pugh for evaluation.[119] ARNP Pugh noted a lot of stress related to Plaintiff's financial situation.[120] On mental status examination, Plaintiff was dressed appropriately; had good eye contact; had normal speech volume and rate; had a sad, depressed and anxious mood; had intact insight, judgment, memory, and concentration; and had normal thought content with no homicidal or suicidal ideations.[121] ARNP Pugh diagnosed Plaintiff with generalized anxiety disorder and major depressive disorder, single episode, mild.[122] One week later, on November 5, 2019, Plaintiff presented to counselor Nelda Gonzalez[123], who found on mental status examination that Plaintiff had appropriate dress, good eye contact, rapid/pressured and slurred

---

[117] AR 574-575.

[118] AR 576.

[119] AR 556.

[120] *Id.*

[121] AR 557.

[122] AR 559.

[123] It does not appear that Ms. Gonzalez has a title or license.

speech, euthymic mood, tangential thought content, intact insight and judgment, intact memory, and intact attention and concentration.[124]

On December 16, 2019, Plaintiff presented to Nelda Gonzalez, who found on mental status examination that Plaintiff had appropriate dress, good eye contact, rapid/pressured and slurred speech, euthymic mood, tangential thought content, intact insight and judgment, intact memory, and intact attention and concentration.[125] The next day, on December 17, 2019, Plaintiff presented to ARNP Pugh, and reported that the medication she had been taking for the last two years was not working.[126] Plaintiff complained of mostly financial struggles following divorce from her husband and the need to live off her earnings as a day care manager.[127] On mental status examination, Plaintiff had appropriate dress, good eye contact, normal speech, depressed and anxious mood, goal directed and organized thought content, intact insight and judgement, intact memory, intact concentration and attention and no homicidal or suicidal ideation.[128] ARNP Pugh

---

[124] AR 552-555.

[125] AR 540.

[126] AR 532.

[127] AR 532.

[128] AR 533-534.

diagnosed generalized anxiety disorder and major depressive disorder, single episode, mild.[129]

On January 16, 2020, Plaintiff presented to Nelda Gonzalez.[130] On examination, Ms. Gonzalez noted that Plaintiff had rapid and slurred speech and a tangential thought process, but otherwise found normal mental status findings.[131] On January 28, 2020, Plaintiff presented to Nelda Gonzalez.[132] Her main complaint was the stress of raising her children after divorce from her husband.[133] Plaintiff reported that she was not taking medication for her anxiety.[134] On examination, Ms. Gonzalez again noted that Plaintiff had rapid and slurred speech and a tangential thought process, but otherwise found normal mental status findings.[135]

---

[129] AR 535.

[130] AR 519.

[131] AR 524.

[132] AR 514.

[133] *Id.*

[134] *Id.*

[135] AR 518.

On February 25, 2020, Plaintiff presented to ARNP Pugh for follow up.[136] Plaintiff reported full-time work as a day care manager in her home.[137] On examination Plaintiff was alert, concentration was "ok", appearance was appropriate, behavior was normal, speech was normal, mood was depressed and anxious, insight and judgment were intact and concentration and attention were intact.[138]  ARNP Pugh assessed generalized anxiety disorder and major depressive disorder, single episode, mild.[139]  On February 27, 2020, Plaintiff presented to Nelda Gonzalez with complaints that she felt anxious when her children were visiting their father.[140] On examination, her mental status was in normal limits other than tangential thought and speech abnormalities.[141]

On May 26, 2020, Plaintiff presented to ARNP Pugh.[142]She reported worry that her children would need to remote learn due to the virus and reported that she had a knee replacement.[143] On examination, Plaintiff was clean, friendly, alert, and

---

[136] AR 502.

[137] *Id.*

[138] AR 502-503.

[139] AR 505.

[140] AR 495.

[141] AR 500.

[142] AR 486.

[143] *Id.*

had good eye contact, appropriate mood and affect, normal thought process and content, normal speech, intact concentration and attention, and good insight.

On July 27, 2020, Plaintiff presented to ARNP Pugh.[144] She reported annoyance that her children were not doing work at home due to Covid.[145] On examination, she was alert and oriented, and ARNP Pugh opined that her functional status was good.[146] Plaintiff was clean, friendly, alert, and had good eye contact, appropriate mood and affect, normal thought process and content, intact concentration and attention, and good insight.[147]

On August 3, 2020, Plaintiff reported stress and anxiety due to children's visitation with their father.[148] She reported that she was still watching children.[149]

On September 3, 2020, Plaintiff presented to Nelda Gonzalez and reported that her depression was improving.[150] On examination, Plaintiff was appropriately dressed and cooperative, her mood was euthymic, she was goal-directed with

---

[144] AR 464.

[145] AR 464.

[146] AR 464-465.

[147] AR 465-466.

[148] AR 462.

[149] *Id*.

[150] AR 450.

normal thought content and intact insight, and her memory and attention were intact.[151]

On October 5, 2020, Plaintiff presented to ARNP Debra Pugh stating that "things are going crazy."[152] Plaintiff reported that her prescribed medications were helping her anxiety and depression.[153] On examination, Plaintiff was clean, friendly, alert, had good eye contact, had appropriate mood and affect, had normal speech, had normal gait, was goal directed with normal thought content, had intact attention and concentration, had good insight and judgment, and had good immediate memory.[154] ARNP Pugh assessed generalized anxiety disorder, and major depressive disorder, single episode, mild.[155]

On October 7, 2020, Plaintiff presented to Nelda Gonzalez reporting extreme anxiousness and irritability due to her struggles with homeschooling her children.[156] On examination her behavior, mood, speech, thought content, insight, and concentration were within normal limits.[157]  On October 14, 2020, Plaintiff

---

[151] Id.

[152] AR 446.

[153] Id.

[154] AR 447-448.

[155] AR 448.

[156] AR 444.

[157] Id.

presented to Ms. Gonzalez and reported that she was having hard time with home schooling her children.[158] On examination, Plaintiff was appropriately dressed and cooperative, her mood was euthymic, she was goal directed with normal thought content and intact insight, and her memory and attention were intact.[159]  On October 28, 2020, Plaintiff presented to Ms. Gonzalez and reported that she was having a hard time home schooling her children.[160] On examination, Plaintiff was appropriately dressed and cooperative, her mood was euthymic, she was goal directed with normal thought content and intact insight, and her memory and attention were intact.[161]

In June of 2021, Plaintiff reported financial struggles following the loss of two of the children she babysat.[162] On July 21, 2021, Plaintiff presented to Ms. Gonzalez and reported that she applied for a job and had a panic attack during a job shadow.[163] However, on July 12, 2021, Plaintiff presented to ARNP Pugh, and reported that things are better; that her depression and anxiety were improving;

---

[158] AR 442.

[159] Id.

[160] AR 440.

[161] *Id*.

[162] AR 1105.

[163] AR 1096.

and that she has days that are manageable and other days not so good.[164] On mental status examination, Plaintiff was friendly and cooperative, with appropriate mood and affect, normal speech, normal speech, goal directed thought process, normal thought content, intact concentration, intact judgment, good insight, intact memory, and good attention span.[165] Throughout 2021, Plaintiff presented to Ms. Gonzalez with reports that she was anxious and stressed due to parenting issues and her mother's health.[166]

On February 10, 2022, Plaintiff presented to Nelda Gonzalez, and reported that her ex-husband had a new girlfriend and that the additional stress of her son's behavior in school increased her anxiety.[167] On March 21, 2022, Plaintiff presented to Ms. Gonzalez, reporting that her ex-husband was re-marrying and she was upset.[168] Ms. Gonzalez noted that Plaintiff's primary impairment was frequent anxiety.[169] On April 25, 2022, Plaintiff presented to Ms. Gonzalez and reported

---

[164] AR 1098.

[165] AR 1098-1099.

[166] AR 1065, 1068, 1070, 1072, 1074, 1076, 1078, 1080, 1082, 1084, 1086, 1088, 1090, 1092, 1094, 1096, 1101, and 1103.

[167] AR 1072.

[168] AR 1065.

[169] *Id.*

feeling stressed and anxious due to parenting issues.[170] Ms. Gonzalez noted little

progress in reaching Plaintiff's goals.[171]

On March 17, 2022, Plaintiff presented to ARNP Gloria Olsson seeking care,

and reporting that she had not been seen for two years since her former provider,

Dr. Pugh, left the practice.[172] Plaintiff reported frequent headaches since being off

medications and dysphoric mood and anxiety.[173] On examination, ARNP Olsson

opined that Plaintiff had normal mood and affect as well as normal behavior.[174] On

March 25, 2022, Plaintiff presented to ARNP Olsson and reported that she felt

good on her medication and was not as emotional.[175] On examination, Plaintiff had

normal mood and affect and normal behavior.[176]On April 13, 2022, Plaintiff

returned to ARNP Olsson for follow-up and reported that she was having

headaches.[177] Plaintiff's blood pressure was elevated and on examination she had

---

[170] AR 1060.

[171] AR 1061.

[172] AR 1109.

[173] *Id.*

[174] AR 1110.

[175] AR 1112.

[176] AR 1112-1113.

[177] AR 1114.

normal behavior and normal mood and affect.[178] ARNP Olsson noted that depression had improved and increased the dosage of Venlafaxine to address headaches.[179]

On June 28, 2022, LMHC Rikki Cook, the clinical director for Three Rivers Therapy, completed a Mental Residual Functional Capacity Form.[180]

### ii.    *Dr. Linda Lindman*

On November 12, 2020, Linda Lindman, PhD, examined Plaintiff at the request of the Commissioner.[181] Plaintiff reported depression that began in her twenties and current symptoms of lack of motivation, fatigue, feelings of worthlessness and hopelessness, and irritability.[182] Plaintiff reported the following symptoms of anxiety: jitteriness, excessive worry, sleep problems, and poor concentration.[183] She reported that her symptoms worsened after her marriage broke up three years prior.[184] Plaintiff reported that problems with her children

---

[178] AR 1115.

[179] *Id.*

[180] AR 1122-1126.

[181] AR 598-604.

[182] AR 598.

[183] *Id.*

[184] *Id.*

increased symptoms and engaging in hobbies relieved them[185] Plaintiff reported being in special education but having attended college.[186] She reported that she watched her own children and babysat for six other children and had done so for the past three years.[187] On examination, Plaintiff was appropriately dressed, her attitude was open and agreeable, her behavior was unremarkable, her mood and affect were anxious, her speech was normal and thought process was goal directed, she was oriented, her memory was good, her fund of knowledge was within normal limits, her concentration was not impaired, and she was able to engage in abstract thinking.[188] Plaintiff stated that she needed no assistance with activities of daily living.[189] Dr. Lindman diagnosed adjustment disorder with depressed mood and anxiety.[190]

Dr. Lindman opined that Plaintiff is able to reason and understand; that she is able to adapt; that her immediate memory is mildly impaired; that her remote and recent memory are unimpaired; that her attention and concentration are unimpaired; her ability to interact with coworkers and the public is not impaired;

---

[185] AR 599.

[186] *Id.*

[187] *Id.*

[188] AR 600-601.

[189] AR 601.

[190] AR 602.

her ability to maintain regular attendance is not impaired; her ability to complete a normal work week is not impaired; and that her ability to deal with stress is mildly impaired if it deals with complex work-related decisions.[191]

4.    <u>Analysis</u>

a.    <u>*The ALJ's consideration of Dr. Davis-Boozler's opinion regarding  Plaintiff's ability to stand*</u>

Dr. Davis-Boozler examined Plaintiff at the request of the Commissioner on January 24, 2021.[192]  Dr. Davis-Boozler conducted a fairly thorough examination and reviewed treatment records from Dr. Stanfield which documented a total knee replacement in Plaintiff's right leg.[193]

Dr. Davis-Boozler assessed that Plaintiff is capable of walking at least four hours, has no limitation in sitting, does not need an assistive device, can lift twenty pounds occasionally and ten pounds frequently.[194]  He listed the following postural limitations: no climbing or balancing and occasional stooping, kneeling, crouching and crawling.[195]  He opined that Plaintiff had no manipulative limitations and no

---

[191] AR 602-603.

[192] AR 850-856.

[193] *Id.*

[194] AR 855.

[195] AR 855-856.

environmental limitations.[196] With regard to the limitation to sitting, Dr. Davis-Boozler noted that the four-hour limitation to sitting might increase or relax based upon Plaintiff's recovery from right knee arthroplasty.[197]

The ALJ found Dr. Davis-Boozler's opinion somewhat persuasive and in doing so stated the following reasoning:

> The opinion of David Davis-Boozer, M.D. is somewhat persuasive. (Ex. 13F). Dr. Davis-Boozer opines that the claimant is limited to light work; can stand/walk for *at least* four hours in an eight-hour workday; and can occasionally stoop, kneel, crouch, and crawl. (Ex. 13F). This opinion is supported by Dr. Davis-Boozer's own examination, during which the claimant demonstrated limited flexion of the knees and slightly reduced strength of the right lower extremity. (Ex. 13F, Page 5). It is also generally consistent with the overall record, which reflects that the claimant has on occasion demonstrated an antalgic gait. (Ex. 4F, Page 15). However, his opinion is somewhat vague in that he opined the claimant could stand/walk "*at least*" 4 hours in an 8-hour day, which is not an opinion as to the *MOST* the claimant can do. The undersigned is charged with establishing a residual functional capacity of the *MOST* the claimant can do. Based upon the overall record with generally normal gait and normal strength, as well as, documented improvement following a surgery only 7 months after the alleged onset date, the undersigned concludes the record supports that claimant can stand/walk the typical requirement for light work and would not be limited to less (such as only 4 hours).

The ALJ's reasoning is flawed for two reasons. First, the ALJ errs in stating that Dr. Davis-Boozler's opinion that Plaintiff can stand "at least" four hours is vague. When read in context the opinion it is not vague and clearly reflects that Dr. Davis-Boozler opined that, at the time of his examination of Plaintiff, she was

---

[196] AR 856.

[197] AR 855.

not capable of completing the standard six-hours standing or walking required for light work. Context is crucial as "treatment records must be viewed in light of the overall diagnostic record."[198]

Dr. Davis-Boozler was a consultative examiner who examined Plaintiff and rendered opinions at the request of the Commissioner.  As an experienced consultant for the Administration, he was familiar with the regulations and policies and was aware that the exertional limitations of light work required standing or walking for six hours. He did not opine that Plaintiff was capable of standing and walking for six hours.  Dr. Davis-Boozler stated clearly that Plaintiff was not fully recovered from her right knee replacement and that at the time of her examination she could reasonably be expected to be able to stand and/or walk for "at least" four hours, indicating that the ability to stand or walk for longer periods was not clear pending recovery.

Second, the  ALJ's reasoning is flawed because she failed to understand Dr. Davis-Boozler's clear opinion that Plaintiff had not fully recovered from her right knee replacement and that for the period prior to Plaintiff's surgery and for, by the ALJ's reasoning, at least seven months thereafter she was further limited in her ability to function. The records indicate that Plaintiff's function improved following her right knee replacement but that prior to the surgery she was quite limited.  A claimant's improvement with treatment is "an important indicator of the intensity

---

[198] *Ghanim*, 763 F.3d at 1164.

1    and persistence of . . . symptoms."[199] Symptom improvement, however, must be

2    weighed within the context of an "overall diagnostic picture."[200]

3            The ALJ erred by discounting both Plaintiff's symptom reports and

4    Dr. Davis-Boozler's opinions regarding her ability to walk for the entire alleged

5    disability period. The record does not show that Plaintiff's symptoms with regard to

6    her right knee improved until at the very least seven months after her surgery, and

7    if Dr. Davis-Boozler's opinion is to be given full-credit, even as of January 2021

8    Plaintiff had not improved to the extent that she could engage in light work.

9            Despite Dr. Davis-Boozler's statement that Plaintiff was not fully recovered

10   from her surgery and that she was capable of standing and walking at least four

11   hours but not longer, the ALJ relied upon her own judgement as to the additional

12   limitations which might have resulted from Plaintiff's recovery.  This is error.

13   First, there is no indication that the ALJ has medical training which would allow

14   her to interpret the raw medical data and make her own medical assessment of the

15

16   [199] 20 C.F.R. § 416.929(c)(3). *See Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d

17   1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with

18   medication are not disabling for the purpose of determining eligibility for SSI

19   benefits.").

20   [200] *Holohan v. Massanari*, 246 F.3d1195, 1205 (9th Cir. 2001); *see also Lester v.

21   Chater*, 81 F.3d 821, 833 (9th Cir. 1995) ("Occasional symptom-free periods ... are

22   not inconsistent with disability.").

23

                                                    DISPOSITIVE ORDER - 36

functional limitations following Plaintiff's surgery.[201]  Secondly, the ALJ has not

explained how she arrived at her conclusions that Plaintiff was capable of standing

and walking for the six hours provided for in her formulated RFC.  Instead, she

offered a conclusory opinion of the expected limitations.[202]

The Court concludes that remand is warranted for the ALJ to properly

consider the opinion evidence and to evaluate the record as a whole, including the

period preceding Plaintiff's surgery and the period of recovery immediately

following it.

### b.    *The ALJ's consideration of LMHC Cook's opinions*

On June 28, 2022, LMHC Cook completed a Mental Residual Functional

Capacity Assessment and identified herself as "clinical director."[203] LMHC Cook

opined that Plaintiff would have no limitation in the ability to maintain socially

appropriate behavior.[204]  LMHC Cook opined that Plaintiff would be moderately

limited regarding the following: the ability to remember locations and work-like

---

[201] ALJs cannot usurp the role of doctors when interpreting medical evidence,

particularly highly technical medical evidence. *Trevizo v. Berryhill*, 871 F.3d 664,

683 (9th Cir. 2017).

[202] *See Garrison v. Colvin*, 759 F.3d 995, 1013-14 (9th Cir. 2014).

[203] AR 1121-1125.

[204] AR 1123.

procedures; the ability to understand short, simple instruction; the ability to carry out short, simple instructions; the ability to sustain an ordinary routine; the ability to make simple work-related decisions; the ability to ask simple questions; the ability to accept instruction or criticism; the ability to get along with coworkers; the ability to set realistic goals; and the ability to adapt or manage herself.[205] LMHC Cook opined that Plaintiff would have a marked limitation regarding the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration; the ability to perform activities within a schedule; the ability to work in coordination with others; the ability to complete a normal workweek without interruption and without unreasonable breaks; the ability to interact with the public; the ability to respond appropriately to changes in the work setting; the ability to be aware of hazards; and the ability to travel in unfamiliar places.[206] LMHC Cook opined that Plaintiff would be off-task 12-20 percent of the time and would be absent two days per month.[207]

The ALJ found LMHC Cook's opinions not persuasive and in doing so reasoned as follows:

> Ms. Cook opines that the claimant has marked limitations in all four areas of "paragraph B" criteria and will be off task for up to 20% of the

---

[205] AR 1122-1124.

[206] AR 1122-1124.

[207] AR 1125.

workday. (Ex. 21F). This opinion is not supported by any noted examination performed by Ms. Cook. It is also not consistent with the overall record, which reflects that the claimant has demonstrated normal memory, mood, attention, and insight. (Ex. 2F, Page 16; Ex. 3F, Page 9; Ex. 4F, Page 11). Moreover, the opinion is specifically contradicted by the findings during the consultative examination (Ex. 10F) which was performed by a PhD, who has much more training, experience and expertise than Ms. Cook's LMHC credentials.[208]

Plaintiff argues that the ALJ erred in finding that Ms. Cook's opinions were contradicted by Dr. Lindman's findings because the ALJ rejected Dr. Lindman's findings for being inconsistent with the record; erred in reasoning that LMHC Cook's opinions were inconsistent with a limited number of examinations; and erred in reasoning that LMHC Cook had not personally examined Plaintiff, without further inquiring what relationship LMHC Cook had to Plaintiff or her counselor, Nelda Gonzalez.

First, the Court concludes that Plaintiff's arguments as to the ALJ's finding that LMHC Cook's opinions were inconsistent with Dr. Lindman's findings is without merit. The ALJ found that LMHC Cook's opinions were inconsistent with Dr. Lindman's findings on examination, and not her opinions. But assuming that she had found the opinions inconsistent, there was also no error because the ALJ did not reject Dr. Lindman's opinions, as Plaintiff asserts, but rather found them somewhat persuasive as opposed to fully persuasive. A finding that an opinion is "somewhat persuasive" cannot reasonably be categorized as a rejection of that

---

[208] AR 26.

opinion.  The ALJ also did not err in reasoning that Dr. Lindman was better

qualified because Dr. Lindman is a licensed psychologist and therefore an

acceptable medical source, while LMHC Cook is not an acceptable medical source,

pursuant to the regulations.[209] It is thus without question that Dr. Lindman was

more qualified than LMHC Cook.  The opinion of an acceptable medical source is

ordinarily entitled to more persuasiveness than that of any non-acceptable medical

source or nonmedical source.

Additionally, the ALJ did not err in considering that Dr. Lindman had

examined Plaintiff and LMHC Cook had neither examined nor treated her.  The

regulations provide that while the ALJ must discuss the factors of consistency and

supportability, and that the ALJ may consider but is not obligated to discuss other

factors such as whether the source rendering an opinion had a treating or

examining relationship with Plaintiff.[210] The ALJ did nothing improper by

considering that Dr. Lindman had examined Plaintiff and LMHC Cook had not.

While the ALJ cited to a limited number of treatment notes when discussing

their inconsistency with LMHC Cook's opinions, it is notable that each of the

treatment notes cited provided which were inconsistent with LMHC Cook's

opinion.  Moreover, the findings of the acceptable medical sources, ARNP Joshua

Anderson, ARNP Debra Pugh, and ARNP Gloria Olsson all indicated benign

---

[209] 20 C.F.R. § 416.902.

[210] 20 C.F.R. § 416.920c

findings, which supported the ALJ's finding that the longitudinal record was not consistent with LMHC Cook's opinions.

The Court finds no error in the ALJ's consideration of LMHC Cook's opinions.

### 5. Summary

Because the ALJ did not give good reasons for her evaluation of the medical opinions of Dr. Davis-Boozler, a remand is warranted.

**B. Plaintiff's Subjective Complaints: The Court finds the issue moot.**

Plaintiff argues the ALJ failed to properly assess her subjective complaints. As discussed above, the ALJ failed to consider the medical record as a whole when considering the medical opinions. Because the Court has remanded the case for consideration of the record as a whole, the ALJ will be required to consider the credibility of Plaintiff's subjective complaints.

**C. Remand for Further Proceedings**

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award benefits, is within the discretion of the court."[211] When the court reverses an ALJ's

---

[211] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

decision for error, the court "ordinarily must remand to the agency for further proceedings."[212]

The Court finds that further development is necessary for a proper disability determination. Here, it is not clear what, if any, additional limitations are to be added to the RFC. Therefore, the ALJ should properly consider the opinion evidence and make findings at each of the five steps of the sequential evaluation process.

## IV.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.      The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.      The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 11 and 15**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

---

[212] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke* 379 F.3d at 595 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 1st day of April 2024.

_____

EDWARD F. SHEA
Senior United States District Judge